In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2008

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

AARON THOMPSON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:14-CR-00090-1 — **William M. Conley**, *Chief Judge.*

ARGUED DECEMBER 16, 2015 — DECIDED FEBRUARY 1, 2016

Before MANION, KANNE, and WILLIAMS, *Circuit Judges.*

KANNE, *Circuit Judge.* An informant working for a drug task force bought crack from Aaron Thompson at the apartment where Thompson was staying. The informant was equipped with two hidden audio-video recording devices that captured the transaction. Thompson moved to suppress the video recordings because, he said, the surreptitious recordings constituted an unlawful search in violation of the Fourth Amendment. The district court disagreed on the

ground that Thompson had invited the informant into the apartment, thus forfeiting his expectation of privacy as to anything he voluntarily disclosed. For the reasons that follow, the judgment of the district court is affirmed.

Investigators enlisted the informant to arrange and carry out a drug transaction in La Crosse, Wisconsin. The informant called a telephone number investigators knew to be associated with the Knox brothers. (The police were investigating the four Knox brothers for drug-related crimes and had identified the apartment from which they were dealing drugs.) The informant told the male who answered the phone that he had four bills—$400—and wanted to buy drugs. The man on the other end of the line told the informant to come over. Investigators equipped the informant with three devices: an audio-video recorder positioned at neck height (commonly referred to as a "button cam"); an audio-video recorder that stayed at waist height (the camera appears to be attached to a set of keys); and an audio recorder. Investigators also gave the informant $400 in marked bills.

The video recordings showed what happened next. The informant approached the apartment building where the transaction was set to take place and knocked on the door of Apartment 4. Thompson opened the door and invited the informant into the apartment. The informant handed Thompson $400. Thompson turned and walked across the room to what the informant thought was the bathroom. Thompson cracked open the door, and reached inside. A person inside the bathroom handed an item to Thompson.

At the same time, another man in the living room told Thompson that he was leaving. Before he departed he

turned on the microwave. He told Thompson to "let that shit cook all the way" and to ice it down and let it cool after the microwave stopped. The man then left the apartment.

A short while later, Thompson handed the informant what he said was "twelve." The informant then left the apartment.

Afterward when the police officers discussed the encounter with the informant, he added several details not captured on video or audio. He said he had heard two men in the bathroom when Thompson opened the door and passed the $400 inside. What Thompson had received in return, the informant explained, was a sandwich bag holding several smaller plastic bags of crack, from which he removed 12. (Lab tests confirmed that the smaller bags contained a total of 2.6 grams of crack.) The informant also said that the item placed in the microwave was a large "soup bowl" filled halfway with what he believed to be cocaine. The informant also saw a box of baking soda sitting next to the microwave. The informant believed that the man was cooking crack in the apartment.

At no point during the transaction did the informant move from the spot where he was standing directly inside the front door. From that vantage point the entire living room and kitchen, as well as the bathroom door, were within sight of the informant and his two video cameras. Two other doors, both open, led off the living room, but the videos are too grainy to see inside those rooms, and the informant did not mention what, if anything, he could see through those doorways.

After the informant returned from the apartment, one of the investigators applied to a state judge for a search warrant. The officer relayed what the informant had told him during the debriefing. The officer disclosed the fact that the encounter was recorded on video, but recounted only the informant's observations rather than the content of the videos. Nothing in the record indicates that the state judge watched those videos before issuing the search warrant. The search warrant was executed shortly after it was issued, and 8.3 grams of crack were found in the apartment. Thompson was arrested at the scene. Federal prosecutors charged him with one count of distributing the crack to the informant and a second count of possessing for distribution the crack found during execution of the search warrant. *See* 21 U.S.C. § 841(a)(1).

Thompson moved to suppress the two video recordings taken by the informant, but he did not challenge the legality of the search warrant or move to suppress the drugs found in the apartment. He argued that making those surreptitious recordings invaded his privacy in violation of the Fourth Amendment. Thompson theorized that video recording is a greater invasion of privacy than audio recording because, he said, more information can be captured on video. He also argued that, despite his consent to the informant's presence in the apartment, the informant had exceeded the "license" granted him to be in the apartment, and thus became a trespasser, by secretly videotaping the encounter.

A magistrate judge recommended that Thompson's motion be denied. *See* 28 U.S.C. § 636(b)(1)(B). Thompson filed objections, *see id.* § 636(b)(1), but while those objections still were pending, he entered a conditional guilty plea to dis-

tributing the crack to the informant, while reserving the right to challenge on appeal any adverse decision by the district court on his motion to suppress. Later the district court accepted the magistrate judge's recommendation, reasoning that Thompson had forfeited any privacy interest in what he voluntarily exposed to the informant. The judge pointed out that the videos had not captured anything that the informant couldn't see with the naked eye. Moreover, the judge said, every federal appellate court to decide the issue had concluded that there is no constitutionally relevant distinction between secret audio and video recordings when the informant gathers the information from a location where he is lawfully entitled to be.

The district judge then sentenced Thompson to 36 months' imprisonment, significantly below the guidelines range of 151 to 188 months. The guidelines range was based on Thompson's status as a career offender because of two convictions for a controlled substance offense. *See* U.S.S.G. § 4B1.1(a). But the district judge exercised his discretion under *United States v. Corner*, 598 F.3d 411, 415–16 (7th Cir. 2010), to go below that range because he believed that Thompson's convictions and limited past incarceration did not warrant such a long prison sentence.

Thompson makes two arguments challenging the denial of his motion to suppress the videos. First, under the trespass theory articulated in *United States v. Jones*, 132 S. Ct. 945 (2012), Thompson argues that the informant exceeded the scope of his license to be in the apartment as an invitee when he recorded videos of the encounter. Second, he argues that making the video recordings violated his reasonable expectation of privacy because the information they revealed was

not voluntarily disclosed. We have not decided whether making a covert video recording, as opposed to an audio recording, violates a person's reasonable expectation of privacy, but three other circuits have concluded that it does not. *See United States v. Wahchumwah*, 710 F.3d 862, 866–68 (9th Cir. 2013); *United States v. Brathwaite*, 458 F.3d 376, 379–81 (5th Cir. 2006); *United States v. Davis*, 326 F.3d 361, 364–67 (2d Cir. 2003). We agree with these courts.

Thompson has never challenged the search warrant or moved to suppress the drugs recovered during its execution, which leaves us puzzled about the point of this appeal. Evidence might be inadmissible if discovered while executing a search warrant that rests principally on information obtained illegally. *See United States v. Scott*, 731 F.3d 659, 664 (7th Cir. 2013); *United States v. Oakley*, 944 F.2d 384, 386 (7th Cir. 1991). But a search warrant based partly on tainted evidence will "still support a search if the 'untainted information, considered by itself, establishes probable cause for the warrant to issue.'" *United States v. Gray*, 410 F.3d 338, 344 (7th Cir. 2005) (quoting *Oakley*, 944 F.2d at 386). Here, the informant gave statements to police about what he heard and saw in the apartment. When the officer applied for the search warrant, he testified only about information that could have been gleaned from the reliable informant's statements, without watching the video evidence. And there is no argument that the use of the informant was unlawful. So the videos, for all practical purposes, did not contribute to the finding of probable cause for the search warrant, and thus the 8.3 grams of crack found while executing the warrant could not possibly be subject to suppression even if the videos might be.

Nevertheless, Thompson seeks to suppress the video evidence on Fourth Amendment grounds, and we address each of his arguments in turn. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches, unless they fall into a recognized exception, are unreasonable. *See Katz v. United States*, 389 U.S. 347, 357 (1967); *United States v. DiModica*, 468 F.3d 495, 499 (7th Cir. 2006). A search occurs either when the government physically intrudes without consent upon "'a constitutionally protected area in order to obtain information,'" *Jones*, 132 S. Ct. at 951 (quoting *United States v. Knotts*, 460 U.S. 276, 286 (Brennan, J., concurring), or "when an expectation of privacy that society is prepared to consider reasonable is infringed," *United States v. Karo*, 468 U.S. 705, 712 (1984) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). Thompson first argues that the video recordings were obtained in violation of the Fourth Amendment because, he insists, the informant exceeded the scope of his license to be in the apartment. Thompson does not dispute that he invited the informant into the apartment. But, says Thompson, the license he gave the informant to enter the apartment did not extend to the informant's specific purpose of visually recording the interaction. *See Florida v. Jardines*, 133 S. Ct. 1409, 1416 (2013) ("The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose."). In *Jardines*, the Supreme Court held that the use of a narcotics-detection dog by police on the front porch of a home constituted an unreasonable search because taking the dog onto the porch "reveal[ed] a purpose to conduct a search, which is not what anyone would think [the officers] had license to

do." *Id.* at 1417. The Court explained that "the background social norms that invite a visitor to the front door do not invite him there to conduct a search." *Id.* at 1416.

Thompson's reliance on *Jardines* is unconvincing. It is firmly established that the government may use informants and that an informant's failure to disclose his true identity does not render consent to his presence invalid. *See Hoffa v. United States*, 385 U.S. 293, 302 (1966); *Lewis v. United States*, 385 U.S. 206, 208–09 (1966); *United States v. Scherer*, 673 F.2d 176, 182 (7th Cir. 1982). Moreover, "[t]he mere purpose of discovering information in the course of engaging in … permitted conduct does not cause it to violate the Fourth Amendment." *Jardines*, 133 S. Ct. at 1416 n.4 (internal quotation marks and citation omitted); *see Kyllo v. United States*, 533 U.S. 27, 32 (2001) ("[V]isual observation is no 'search' at all."). And when the informant discovers information from where he is lawfully entitled to be, the use of a recording device to accurately capture the events does not vitiate the consent or otherwise constitute an unlawful search. *See Jones*, 132 S. Ct. at 952 (citing *On Lee v. United States*, 343 U.S. 747, 751–52 (1952), for the proposition that no search or seizure occurs "where an informant, who was wearing a concealed microphone, was invited into the defendant's business"); *Lopez v. United States*, 373 U.S. 427, 439 (1963) (explaining that recording by undercover agent is permissible where "the device was not planted by means of an unlawful physical invasion … and it neither saw nor heard more than the agent himself"); *United States v. Eschweiler*, 745 F.2d 435, 438 (7th Cir. 1984) ("We know from *Lopez* that in order to be effective the consent did not have to extend to [the informant's] being wired.").

Here, Thompson invited the informant into the apartment for the purpose of engaging in a drug transaction. While there, the informant did not "see, hear, or take anything that was not contemplated" as part of the illegal drug transaction. *See Lewis*, 385 U.S. at 210; *see also Scherer*, 673 F.3d at 182. That the informant recorded his observations on video did not transform the consensual encounter into a search for purposes of the Fourth Amendment.

Thompson next contends that making the videos constituted a search because he had a reasonable expectation of privacy in the information captured by the recordings, and had not voluntarily disclosed that information to the informant. This argument is frivolous. The expectation of privacy does not extend to "[w]hat a person knowingly exposes to the public, even in his own home or office." *Katz*, 389 U.S. at 351; *see Scott*, 731 F.3d at 664. Nor does a person have a privacy interest in what he voluntarily discloses to an informant. *See Hoffa*, 385 U.S. at 300–02; *United States v. White*, 401 U.S. 745, 749 (1971) ("[H]owever strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the authorities."). Thus, once Thompson invited the informant into the apartment, he "forfeited his privacy interest in those activities that were exposed to [the informant]." *Davis*, 326 F.3d at 366; *see Wahchumwah*, 710 F.3d at 867; *Brathwaite*, 458 F.3d at 380–81; *see also United States v. Lee*, 359 F.3d 194, 201 (3d Cir. 2004) ("The principle underlying the governing Supreme Court cases is that if a defendant consents to the presence of a person who could testify about a meeting and is willing to reveal what occurs, the defendant relinquishes any legitimate

expectation of privacy with respect to anything the testimony could cover.").

Moreover, it is well established that in identical circumstances an audio recording taken by an informant would not transform his actions into a search. *See White*, 401 U.S. at 751 ("If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent … ."); *In re John Doe Trader Number One*, 894 F.3d 240, 243–45 (7th Cir. 1990). Thompson argues, though, that a video recording involves a greater intrusion on privacy because more information and detail is captured than with an audio recording. But this distinction, even if theoretically true, is irrelevant to the extent that an informant or undercover agent is using surveillance equipment that's no more sensitive than the human ear or eye. *Cf. Kyllo*, 533 U.S. at 33–34 ("[O]btaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area constitutes a search—at least where … the technology in question is not in general public use.") (citation and quotation marks omitted)).

The video cameras in this case captured nothing more than what the informant could see with his naked eye. In fact, the videos are of such poor quality that many of the things the informant reportedly saw are not readily apparent on the recordings, including the existence and size of the bowl placed in the microwave, the contents of the large sandwich bag handed to Thompson through the bathroom door, and the box of baking soda next to the microwave.

Perhaps Thompson anticipates that rapidly evolving technology soon will allow informants to see through opaque surfaces or into areas remote from their location or not visible to the eye.[*]

That concern is not for us to address today. And, as already discussed, Thompson retained no privacy interest in the areas captured by the camera. The informant would have been permitted to testify to the things he saw in Thompson's apartment, just as he would have been able to testify about the content of the conversations he had or heard. *See Hoffa*, 385 U.S. at 302–03; *Brathwaite*, 458 F.3d at 381; *Davis*, 326 F.3d at 367. Just because the informant made video recordings, Thompson cannot escape the long-standing principle that a person does not have a constitutional right "to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment." *Lopez*, 373 U.S. at 439; *see Davis*, 326 F.3d at 367.

Accordingly, the judgment of the district court is AFFIRMED.

---

[*] For example, development is underway for a hyperspectral camera that can see through surfaces and can be used with a cellphone camera. *See The $50 hypercam that could give your phone 'X-ray vision' to see inside objects*, http://www.dailymail.co.uk/sciencetech/article-3275044/The-50-hypercam-phone-X-ray-vision-inside-objects-tell-fruit-ripe.html.