In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-1950

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARLES HOUSE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:20-cr-00021-SEB-MJD-1 — **Sarah Evans Barker**, *Judge.*

SUBMITTED SEPTEMBER 4, 2024 — DECIDED NOVEMBER 5, 2024

Before ROVNER, BRENNAN, and LEE, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Three years ago, we held that the warrantless use of pole cameras to observe a home does not amount to a "search" under the Fourth Amendment. *United States v. Tuggle*, 4 F.4th 505, 511 (7th Cir. 2021). Charles House asks us to reconsider that decision, even as he recognizes that no intervening Supreme Court decision requires reevaluation, and that *Tuggle* forecloses the issues he raises in this appeal. We reaffirm *Tuggle*, as our decision then, as now, rests on

Supreme Court precedent and is consistent with the rulings
of other federal courts to have considered this issue. The dis-
trict court correctly relied on *Tuggle* in denying House's mo-
tion to suppress. We affirm.

**I**

The facts are undisputed on appeal. House traveled to Cal-
ifornia on several occasions in 2018 and 2019 to obtain large
quantities of marijuana and methamphetamine. He then
shipped the drugs back to addresses associated with him in
Anderson, Indiana. On one such occasion in October 2018,
FedEx personnel contacted law enforcement to alert them to
suspicious packages scheduled for delivery to various loca-
tions in Anderson.[1] Officers arranged to meet with the FedEx
employee delivering the packages to investigate further. They
arrived at a predetermined location with a drug-sniffing dog
and observed twelve packages of various sizes, shapes, and
packaging materials. The dog positively indicated that five of
the twelve packages contained drugs.

Based on the FedEx alert and the dog's indications, officers
applied for a state warrant authorizing the search of the five
packages. All five packages were sent from the same location
in California and addressed to different places in Anderson,
including across the street from House's residence. When
opened, two packages contained plastic bags of crystal

---

[1] The record does not explain why FedEx personnel contacted law en-
forcement about House's packages. A law enforcement officer testified at
trial to reasons why packages may raise concern: (1) extensive taping and
packaging to prevent canine odor identification; (2) return addresses from
known drug origin cities; (3) use of pseudonyms for addressor or ad-
dressee; or (4) delivery to abandoned or incorrect addresses.

methamphetamine and three contained plastic bags filled with marijuana. The quantity of marijuana and methamphetamine discovered was consistent with an intent to distribute the drugs, not merely to possess them for personal use.

On January 8, 2019, law enforcement put up a pole camera pointed at House's residence and allowed it to continuously record footage until February 5, 2020. The pole camera captured only video and could be viewed live or reviewed later. When watching the recording live, officers could zoom in or pan out the camera to aid in the investigation. An investigating officer later testified that he monitored the pole camera every day during the thirteen months that the camera was operating.

Law enforcement identified several patterns of behavior on the pole camera footage. For example, when packages arrived across the street from House's residence, he promptly picked them up, and the number of visitors to his home immediately increased. This and other patterns served as the basis for obtaining flight and delivery records that linked House to those shipments. The pole camera footage also allowed the government to identify a confidential informant, who agreed to help establish House's role in selling drugs.

In a twelve-count indictment, House was ultimately charged with attempted possession with intent to distribute methamphetamine and conspiracy to possess with intent to distribute marijuana, both under 21 U.S.C. §§ 841(a)(1) and 846, distribution of marijuana under 21 U.S.C. § 841(a)(1) and (b)(1)(D), unlawful use of a communication facility under 21 U.S.C. § 843(b), and possession of a firearm by a convicted felon under 18 U.S.C. § 922(g)(1). House moved to suppress the pole camera evidence. He acknowledged that *Tuggle*

forecloses his motion, but he sought to preserve the claim for
further review. The district court denied House's motion
based on *Tuggle*. The jury found House guilty on all counts
and the court sentenced him to 360 months' imprisonment.

## II

House appeals the denial of his motion to suppress. We
review that court's legal conclusions de novo. *United States v.
Ostrum*, 99 F.4th 999, 1004 (7th Cir. 2024).

The Fourth Amendment protects "[t]he right of the people
to be secure in their persons, houses, papers and effects,
against unreasonable searches and seizures." U.S. CONST.
amend. IV. The Supreme Court has said that the Fourth
Amendment safeguards "the privacy and security of individ-
uals against arbitrary invasions by governmental officials."
*Camara v. San Francisco*, 387 U.S. 523, 528 (1967). "Warrantless
searches are per se unreasonable under the Fourth Amend-
ment, subject to only certain exceptions." *United States v. Ki-
zart*, 967 F.3d 693, 695 (7th Cir. 2020) (*citing Arizona v. Gant*,
556 U.S. 332, 338 (2009)). Generally, when the government ob-
tains evidence without a warrant and in violation of an indi-
vidual's Fourth Amendment rights, the remedy is the sup-
pression of that evidence. *United States v. McGill*, 8 F.4th 617,
624 (7th Cir. 2021). The government did not seek a search war-
rant here before installing the pole camera and no recognized
exception to the warrant requirement applies.

To determine whether the government conduct here con-
stitutes a "search" within the meaning of the Fourth Amend-
ment, we apply the "privacy-based approach" first articulated
by Justice Harlan in his concurrence in *Katz v. United States*,
389 U.S. 347, 361 (1967). *See United States v. Lewis*, 38 F.4th 527,

534 (2022). We ask first whether the defendant "manifested a subjective expectation of privacy in the object of the challenged search," and second, whether "society [is] willing to recognize that expectation as reasonable." *California v. Ciraolo*, 476 U.S. 207, 211 (1986). *Tuggle* concluded that a defendant has no expectation of privacy in the activities in front of and outside his house when such activities are readily observable by any ordinary passerby. *Tuggle*, 4 F.4th at 516–17. House asks this court to reconsider this reasoning.

The First Circuit, sitting en banc, deadlocked on this question. *See United States v. Moore-Bush*, 36 F.4th 320, 320 (1st Cir. 2022) (en banc). House relies on a concurrence from that case to support his position that the prolonged use of warrantless pole camera surveillance constitutes a search under the Fourth Amendment. *Id*. at 320–60.[2]

**A**

We consider first whether the isolated use of a warrantless pole camera directed at House's residence violated his Fourth Amendment rights. The first prong of the *Katz* inquiry asks whether a defendant "exhibited an actual (subjective) expectation of privacy." *Katz*, 389 U.S. at 361 (Harlan, J., concurring). In *Ciraolo*, the Supreme Court suggested that a defendant could manifest a subjective expectation of privacy by erecting a fence around his property. Such "normal precautions" could prevent "casual, accidental observation" from sidewalk traffic. 476 U.S. at 211–12. Still, the fence in *Ciraolo* was insufficient to shield the defendant's property when

---

[2] *Moore-Bush* includes two concurrences. Our opinion discusses the first. The second agrees with the reasoning and conclusions in *Tuggle*. 36 F.3d at 361–73.

police took photographs from a low-flying plane. *Id*. By contrast, a defendant who erected a fence around his backyard, "screening the activity within from the views of casual observers," shielded his property from pole camera surveillance. *United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987) (relying on the subjective expectation analysis articulated in *Ciraolo*).

House did not express a subjective expectation of privacy of the kind that *Ciraolo* recognized as valid for shielding the activities in the curtilage of a home. The record does not suggest that he tried to shield the front of his residence from the eyes of ordinary passersby. The lack of fencing in front of House's residence eliminates the more difficult question whether the government could install a camera without a warrant to surveil over the top of the visual barrier created by a fence.[3] The pole camera surveillance here gave law enforcement no greater access to House's residence than would be available to any observer on the sidewalk.

The subjective prong of the *Katz* inquiry does not end the analysis. The objective question asks whether House has an expectation of privacy that society is prepared to consider reasonable.

"'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (*quoting Silverman v. United States*,

---

[3] At trial, an officer testified that the pole camera pointed at the front of House's residence did not allow investigators to see past the privacy fence surrounding House's backyard. No evidence was provided at trial about activities occurring in House's backyard.

365 U.S. 505, 511 (1961)). This court has explained this "expectation of privacy does not extend to '[w]hat a person knowingly exposes to the public, even in his own home or office.'" *United States v. Thompson*, 811 F.3d 944, 949 (7th Cir. 2016) (*quoting Katz*, 389 U.S. at 351). The Supreme Court has also clarified that the "Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." *Ciraolo*, 476 U.S. at 213; *Kyllo*, 533 U.S. at 32 ("[V]isual observation is no 'search' at all."). Twice this court has decided that a person has "no reasonable expectation of privacy in the driveway and gravel walkways" near his home. *United States v. French*, 291 F.3d 945, 955 (7th Cir. 2002); *United States v. Evans*, 27 F.3d 1219, 1228 (7th Cir. 1994).

House knowingly exposed the outside of his residence to the public. He cannot then articulate an expectation of privacy in the front of his residence that society would be willing to recognize as reasonable. Law enforcement officers were not obligated to "shield their eyes" or turn off their cameras when observing from public thoroughfares the activities taking place in the front of House's residence.

Notably, *Tuggle* rejected the argument that a technology is valid as long as the government "could theoretically accomplish the same surveillance—no matter how laborious—through some nontechnological means." 4 F.4th at 526. It follows, House submits, that the intrusion into personal privacy caused by the use of a pole camera is unconstitutional, even if visual or physical surveillance remains a valid police practice. The question then is whether a pole camera falls within the class of technologies that are invalid under the Fourth Amendment absent a valid search warrant. The prototypical

example of constitutionally impermissible technology is a thermal imaging device that can scan inside a suspect's home while the officer remains outside. *See Kyllo*, 533 U.S. at 30. The Court held that the use of "a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion" amounts to a Fourth Amendment search "and is presumptively unreasonable without a warrant." *Id*. at 40.

In contrast, law enforcement's use of cameras to assist investigations has been repeatedly approved. In *Dow Chemical Co. v. United States*, the Court held that taking aerial photographs of an industrial plant complex from navigable airspace did not constitute a search under the Fourth Amendment. 476 U.S. 227, 239 (1986). The Court similarly held that a Fourth Amendment search did not occur when law enforcement observed and photographed a suspect's marijuana plants from a low-flying plane. *See Ciraolo*, 476 U.S. at 209–10. Observation from "public navigable airspace" and "in a physically nonintrusive manner" was not the type of unreasonable observation that society is prepared to accept, the Court explained. *Id*. at 213. In *Tuggle* we decided that the government's use of cameras to observe the exteriors of private homes is constitutional. 4 F.4th at 516 ("Now more than ever, cameras are ubiquitous, found in the hands and pockets of virtually all Americans, on the doorbells and entrances of homes, and on the walls and ceilings of businesses."). Like the cameras in *Dow Chemical* and *Ciraolo*, the pole camera here (as in *Tuggle*) is a technology in general public use that does not offend the Fourth Amendment. *Kyllo*, 533 U.S. at 40.

We reiterate our holding in *Tuggle*: the government does not invade an expectation of privacy that society is prepared

to accept as reasonable when the government uses a common technology, located where officers are lawfully entitled to be, and captures events observable to passersby. The isolated use of a pole camera does not amount to a Fourth Amendment search. 4 F.4th at 516–17.

**B**

While House does not take issue with the isolated use of pole camera surveillance, he argues that the prolonged use of a warrantless pole camera constitutes a Fourth Amendment search. *See* Appellant's Br. at 12 ("[O]ne has no reasonable expectation of privacy in the discrete moments of intimacy that may occur in the front of one's home …, [but] it does not follow that the same is true with respect to an aggregation of those moments over many months.") (*quoting Moore-Bush*, 36 F.4th at 336) (Appellant's emphases).

This case is not the vehicle to challenge the duration of the surveillance of House's residence. Warrantless pole cameras surveilled Tuggle's residence for eighteen months, 4 F.4th at 510; House's residence was surveilled with a pole camera for thirteen months. Even if the duration of warrantless surveillance may be otherwise relevant, a challenge to the shorter surveillance here is foreclosed by *Tuggle*.

Still, House's central argument against the sustained use of pole cameras would invalidate the practice here and in *Tuggle*. He contends that if this court applies the "mosaic theory"—the idea that the "government can learn more from a given slice of information if it can put that information in the context of a broader pattern, a mosaic"—we will conclude that the warrantless and prolonged use of pole camera surveillance is unconstitutional. *See* Matthew B. Kugler & Lior

Jacob Strahilevitz, *Actual Expectations of Privacy, Fourth Amendment Doctrine, and the Mosaic Theory*, 2015 SUP. CT. REV. 205, 205 (2015).

First articulated in *United States v. Maynard*, 615 F.3d 544, 562 (D.C. Cir. 2010), the mosaic theory has been discussed but not adopted by the Supreme Court. *See United States v. Jones*, 565 U.S. 400, 416 (2012); *Riley v. California*, 573 U.S. 373, 394 (2014); and *Carpenter v. United States*, 585 U.S. 296, 311 (2018). The theory examines the government's method of investigation and asks "whether a set of nonsearches aggregated together amount to a search because their collection and subsequent analysis creates a revealing mosaic." Orin S. Kerr, *The Mosaic Theory of the Fourth Amendment*, 111 MICH. L. REV. 311, 320 (2012). Put another way, while isolated pole camera surveillance would not offend the Fourth Amendment under the mosaic theory, surveillance that captures enough information to create a comprehensive account of a suspect's movements could. How much information would be enough to create a Fourth Amendment violation under the theory presents "an obvious line-drawing problem." *Tuggle*, 4 F.4th at 526.

When confronting this same question on similar facts in *Tuggle*, we declined to apply the mosaic theory because the Supreme Court had not directed lower courts to do so. *Id.* at 519–20. In *Tuggle* this court reasoned that even if the theory applied, the result would be the same. The footage obtained from the pole cameras "did not paint the type of exhaustive picture of [Tuggle's] every movement" that the Supreme Court said violates the Fourth Amendment in other contexts. *Id*. at 524 (*citing Jones*, 565 U.S. at 415; *Carpenter*, 585 U.S. at 310–11).

House asks this court to reconsider this reasoning in light of the first concurrence in *Moore-Bush* from the First Circuit. 36 F.4th at 320–60. That opinion criticized the treatment of the mosaic theory in *Tuggle* on two grounds. First, it pressed for the application of the mosaic theory, as lower courts need not wait for the Supreme Court to apply a theoretical framework. *Moore-Bush*, 36 F.4th at 358. Second, it said *Tuggle* misread *Carpenter*, disregarding evidence that the Supreme Court "did embrace something akin to the mosaic theory." *Id*.

But the Supreme Court has not adopted the mosaic theory, even if some of the justices in various opinions in *Carpenter*, *Jones*, and *Riley* discussed it. *Jones*, for example, considered whether the installation of a GPS tracking device on a defendant's vehicle constituted a search under the Fourth Amendment. 565 U.S. at 404. While the majority declined to rely on the mosaic theory, the Court held that the government had trespassed on private property when it attached a GPS device to the defendant's vehicle without a warrant. *Id*. at 404–07. In separate concurrences, Justice Alito and Justice Sotomayor embraced the logic of the mosaic theory. But references to that theory in concurrences is not a holding. The Court has never adopted the mosaic theory and has not bound lower courts to apply it.

The first concurrence from *Moore-Bush* conceded that the Supreme Court did not command application of the mosaic theory. Rather, it saw "no reason why lower courts must … await controlling word from the Supreme Court before finding the Constitution to be protective." *Moore-Bush*, 36 F.4th at 358. We disagree with that concurrence's premise that prolonged pole camera surveillance violates the Constitution. It does not convince us otherwise, and nothing else has changed

in the legal landscape since *Tuggle* to persuade us that the mosaic theory applies here.

Nor are we persuaded by the First Circuit's attempt to analogize pole camera surveillance to the technology employed in *Carpenter*. As we reasoned in *Tuggle*, pole camera surveillance lacks the all-encompassing and retrospective capabilities of the technologies at issue in *Carpenter*, *Jones*, and *Riley* that made them unconstitutional surveillance methods under the Fourth Amendment. In *Carpenter*, the Court considered whether the government conducted a search when it accessed historical cell-site location information ("CSLI"), a time-stamped record generated every time that a cell phone connects to a cell site. 585 U.S. at 302. The precision of the records generated "depends on the size of the geographic area covered by the cell site," which has steadily become more granular to satisfy demand generated by increased cell phone usage. *Id.* at 301. As people commonly carry their cell phones wherever they go, the wireless carriers "chronicle a person's past movements through the record of his cell phone signals." *Id.* at 309. The Court in *Carpenter* held that the government's ability to access historic records that trace a defendant's whereabouts for a period of seven days constituted a violation of the Fourth Amendment. The Court explained that the investigative technology violated the defendant's reasonable expectation of privacy because it "provide[d] an all-encompassing record of the holder's whereabouts" that revealed "not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" *Id.* at 311 (*citing Jones*, 565 U.S. at 415) (Sotomayor, J., concurring).

*Tuggle* distinguished pole camera surveillance from CSLI technology. "[S]tationary cameras placed around Tuggle's house captured an important sliver of Tuggle's life," but not the full record of his whereabouts that could be gleaned from CSLI. *Tuggle*, 4 F.4th at 524. Unlike CSLI, the pole camera "exposed no details about where Tuggle traveled, what businesses he frequented, with whom he interacted in public, or whose homes he visited, among many other intimate details of his life." *Id*.

Pole cameras also differ from surveillance technologies that have retrospective capabilities. *See Tuggle*, 4 F.4th at 525. In *Riley* and *Carpenter*, the Supreme Court said the retrospective quality of surveillance techniques was relevant to finding a Fourth Amendment violation. In *Riley*, the Court considered whether the government's search of the contents of a defendant's cell phone without a warrant was unlawful. *See Riley*, 573 U.S. at 379. The Court ruled that the warrantless search of a cell phone violated the Fourth Amendment because it gave the government access to "a digital record of nearly every aspect of [defendants'] lives—from the mundane to the intimate." *Id.* at 395. Unbridled access to cell phone data permitting "the police to scrutinize such records on a routine basis is quite different from allowing them to search a personal item or two in the occasional case." *Id*. In dicta, the Court noted that cell phones had the capacity to provide historic location information that could "reconstruct someone's specific movements down to the minute, not only around town but also within a particular building." *Id*. at 396.

At issue in *Carpenter* was the constitutionality of searching historic location information. There, the Court explained the "retrospective quality" of CSLI data provided the

government "access to a category of information otherwise unknowable." *Carpenter*, 585 U.S. at 312. This kind of information, the Court observed, would allow the government to go back in time to surveil a suspect's activities before he was ever suspected in the first place. *See id*. CSLI data thus contravened the defendant's reasonable expectation of privacy when it allowed the government to "travel back in time to retrace a person's whereabouts" for up to five years of logged data from the wireless carrier. *Id*.

Shortly after *Carpenter*, this court suggested the retrospective quality of surveillance data played a key role in the Supreme Court's analysis. *See United States v. Hammond*, 996 F.3d 374, 382 (7th Cir. 2021). "The 'narrow' *Carpenter* decision did not determine whether the collection of real-time CSLI" involving individuals on public roadways, which was at issue in *Hammond*, posed a Fourth Amendment problem. *Id*. at 387. Unlike historic CSLI, obtaining real-time CSLI data in such instances was an acceptable surveillance method. *Id*. at 383. Similarly, we emphasized in *Tuggle* the "prospective and nonhistorical" nature of pole camera surveillance. *Tuggle*, 4 F.4th at 525. Unlike technologies that permit retrospective surveillance, pole cameras captured real-time video footage and so did not present difficult questions about conducting surveillance into the past. *Id*.

But the first concurrence in *Moore-Bush* sees it differently. That opinion disagrees with *Tuggle* that the retrospective nature of the information in *Carpenter* is dispositive. *See Moore-Bush*, 36 F.4th at 348 ("[W]e do not understand *Carpenter* to suggest that the creation of a searchable digital record that perfectly accounts for the whole of the movements of a person over a long period of time contravenes a reasonable

expectation of privacy—and thereby effects a search—only when that record was created before the government wished to have it."). Instead, that concurrence declares there is a substantial similarity between CSLI and prolonged pole camera surveillance in that both allow the government "'to travel back in time' with little expense … and to do so 'effortlessly'" to witness a defendant's activities with "perfect precision." *Id.* at 349 (citation to *Carpenter* omitted).

This critique of *Tuggle* misconstrues how law enforcement officers initiate the use of and maintain surveillance with pole cameras. Pole camera surveillance does not permit law enforcement to travel back in time to retrace a suspect's whereabouts or actions. A critical feature of pole camera surveillance is that the "government ha[s] to decide *ex ante* to collect the video footage by installing the cameras." *Tuggle*, 4 F. 4th at 525. "The government did not tap into an expansive, pre-existing database of video footage of Tuggle's home akin to the Internet browsing history and extensive photos stored on cell phones considered in *Riley*, or the expansive CSLI in *Carpenter*." *Id.* In fact, the Court in *Carpenter* explicitly clarified it did not "call into question conventional surveillance techniques and tools." 585 U.S. at 316. Pole camera surveillance is a conventional surveillance technique that enhances observations law enforcement could make by, for example, monitoring a suspect's movements in public during a stakeout. The observation of House's residence during the investigation of his drug-related crimes conformed to this prospective and nonhistorical approach. Pole camera surveillance of House's residence began only after he was suspected of drug dealing. It lasted thirteen months and only captured House's movements in public, which would otherwise be visible to law enforcement if they had conducted a stakeout.

The first concurrence in *Moore-Bush* also concludes that a suspect's expectation of privacy becomes sacrosanct when the surveillance occurs in front of the suspect's home. *See* 36 F.4th at 335. The curtilage is "'intimately linked to the home, both physically and psychologically,' which matters precisely because the home is 'where privacy expectations are most heightened.'" *Id*. (*quoting Ciraolo*, 476 U.S. at 213). Thus, "the claimed expectation of privacy here is not fairly characterized as inhering in a mere 'sliver' of a person's publicly visible life." *Id*. at 337 (internal citation to *Tuggle* omitted). Instead, the prolonged exposure of all visible activities in front of the home—"by revealing patterns of movements and visits over time"—provides a comprehensive vision into a suspect's life. *Id*. at 336.

But as already discussed, a person's expectation of privacy does not extend to the things he knowingly exposes to the public. *See Thompson*, 811 F.3d at 949. The *Katz* analysis does not become more onerous when the place being surveilled is the curtilage of a suspect's home. *See* 389 U.S. at 351 ("[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.").

The mosaic theory does not alter the reasoning as to the surveillance of a home's curtilage. *Tuggle* rejected this argument: "[i]n one sense, the recordings painted a whole picture of the happenings outside Tuggle's front door by recording nonstop for eighteen months. … In another important sense, however, the footage only depicted one small part of a much larger whole." 4 F.4th at 524. Law enforcement's surveillance of a home's curtilage, which is knowingly exposed to the public, does not offend a suspect's reasonable expectation of

privacy. And the extended nature of this surveillance does not transform it into a violation. Because House had no reasonable expectation of privacy in the curtilage of his home, an area readily visible to ordinary passersby, his Fourth Amendment rights were not violated.

## C

Our reasoning here, as in *Tuggle*, is consistent with that of most federal appellate courts to have addressed the constitutionality of warrantless pole camera surveillance. Before *Tuggle*, courts said that this type of investigation technique was not a search. *See United States v. May-Shaw*, 955 F.3d 563, 564–65 (6th Cir. 2020) (finding no violation in the surveillance of the defendant's carport outside his apartment); *United States v. Bucci*, 582 F.3d 108, 116–17 (1st Cir. 2009) (finding no violation in an eight-month long surveillance through a pole camera across the street from the defendant's residence). After *Tuggle*, with the exception of the First Circuit in *Moore-Bush*, each federal appellate court that has confronted the issue has agreed with this reasoning. *See United States v. Dennis*, 41 F.4th 732, 741 (5th Cir. 2022) (finding no violation in the surveillance of the front and back of Dennis' house because "areas open to view of the public without any invasion of the property itself is not alone a violation"); *United States v. Hay*, 95 F.4th 1304, 1314 (10th Cir. 2024) (finding no violation in the installation of a pole camera directed at the front of Hay's house).

## III

We reaffirm our reasoning and holding in *Tuggle* that law enforcement's warrantless use of a pole camera to observe a home on a short- or long-term basis does not amount to a

search under the Fourth Amendment. Our decision, then as now, is grounded in Supreme Court and circuit precedent. House does not present any reasons to reconsider *Tuggle*. And all but one of the federal appellate courts to resolve the same issue have come out the same way. For these reasons, we AFFIRM the district court's denial of House's motion to suppress.

ROVNER, *Circuit Judge*, concurring. As the majority points out, our court has deemed that the use of a pole camera, even for an extended period, does not constitute a search. *United States v. Tuggle*, 4 F.4th 505, 511 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 1107 (2022). Thus, even if this court were to reverse this holding based on the rapidly expanding power of video surveillance teamed with the exponentially growing abilities of artificial intelligence, under the "good faith" exception to the Fourth Amendment's warrant requirement, the government was unquestionably entitled to rely on *Tuggle*. *See Davis v. United States*, 564 U.S. 229, 238–41 (2011). For these reasons I agree with the conclusions of the majority opinion.

Nevertheless, I, like the three concurring judges in *United States v. Moore-Bush* (first concurrence), would conclude that developments in Fourth Amendment jurisprudence along with developments in technology would support the overruling of our precedent in *Tuggle*. *See United States v. Moore-Bush*, 36 F.4th 320 (1st Cir. 2022) (Barron, CJ. concurring), *cert. denied sub nom. Moore v. United States*, 143 S. Ct. 2494 (2023). As those concurring judges said,

> Mindful of the brave new world that the routine use of such all-encompassing, long-term video surveillance of the front curtilage of a home could bring about, we are convinced that the government does conduct a search within the meaning of the Fourth Amendment when it accesses the record that it creates through surveillance of that kind and thus that law enforcement, in doing so, must comply with that Amendment's limitations.

*Id.* at 322.

Whatever the Supreme Court and this court have said about a reasonable person's expectation of privacy in the situation where officers watch one discrete activity viewed at one particular time, the analysis is unquestionably different when the police observe every movement, activity, and association over the course of one month at one of the more intimate and protected of locations—the curtilage of one's home. *Id.* at 327. And as the power and scope of technology increases, courts will need to reckon with how these new technologies change citizens' expectations of privacy in a world where pole camera video can scan and identify faces, read license plates, zoom in on what a person is doing on their phone, and compare actions and activities across various public surveillance systems.

Today our decision in *Tuggle* resolves this case, but I write separately to note that this court and others will have to reconsider those holdings as the capabilities of technology change our understanding of what constitutes a reasonable expectation of privacy.